Your Honor, my name is Joseph Manson, and I'm counsel for Mesa Air Group, the appellant, and I'd like to reserve two minutes for rebuttal, if I may. Okay. We'll try to help you, but keep track of your own time. Thank you. Your Honor, the issue in this case is whether Mesa Airlines' decision to change from applying the Pilot Federal Aviation Regulations to its Flight Attendant Group by then applying the Flight Attendant Federal Aviation Regulations was arguably allowed by its collective bargaining agreements. And if it was, then it's a minor dispute under the Railway Labor Act within the exclusive jurisdiction of the System Board of Adjustment, which is an arbitration panel that has special expertise to resolve issues of interpretation of collective bargaining agreements under the RLA. Am I correct that the Pilot Federal Aviation Regulations are much more restrictive than the Flight Attendant FARs, insofar as tours of duty, layovers, rest periods, hours of employment during the month? They are. They have different provisions, Your Honor. I don't think that you could say that in application they would necessarily be more restrictive, and that's one of the issues in the case because we presented evidence that would show that had we applied the Flight Attendant Regulations instead of the Pilot Regulations, it would have had a de minimis effect on the actual working conditions for the flight attendants in the group. There certainly are differences in those provisions. That's correct. Well, not the least of which is that the Pilot rules basically are stated in terms of hours per month, whereas the Flight Attendant rules are in days per month, and it was hard for me to figure out whether that is a significant difference, but it appears to be a fairly major change. Well, Your Honor, if you look at the scheduling provisions of the contract, there are seven pages of detailed scheduling provisions that, in addition to these FARs, has application here. And you have to look at the context of the FARs in the context of all the provisions in the agreement, which has caps on the number of hours that can be required each month to be flown, that has caps on the minimum number of days off that can be flown. And so the question in the case, Your Honor, we respectfully submit, is whether the contractual language, which refers to applicable Federal aviation regulations, is arguably subject to Mesa's interpretation that it could be either the Pilot Regulations or the Flight Attendant Regulations. I understand that. I mean, the definition here is an odd one, actually. The distinction between major and minor is not how a layperson would think of, is this important or unimportant, adversely affecting in a serious way or not adversely affecting in a serious way, but rather it's minor if your argument is plausible within the CBA, and if it's a new something, then it's major. So the question is, what's the CBA say, and what language do you rely on? Could you put my nose in the language in the CBA that you think supports it? Yes, absolutely, Your Honor. And I would say that there are three components of proof. I'd like to read it with you. Where is it in the excerpts? It's in Section 7. It's ER Tab 16, Exhibit 2, Section 7. There are four specific – Hang on, hang on, hang on, hang on. Okay. So Section 7, scheduling. Okay. That's when it's supposed to be? Page 19? Yes, Your Honor. There are four specific sections in that section that refer to the applicable Federal aviation regulations. And what do you rely on in here? Thank you. If you look at Section G, Reserves G-2, flight attendants on a reserve duty day are on standby for periods up to the applicable FAR maximum. That's one section. If you look at Division 7G-3 and ready reserve, it says that flight attendants may be assigned to ready reserve status or a combination of ready reserve or flying for up to 14 hours, for in 16 hours in the event of irregular operations or the applicable FAR maximum. And there are two other – there are two others in there, Your Honor. Why shouldn't we find that where the parties follow the flight attendant FAR, the pilot FARs for 13 years, that that constitutes a pattern or practice which amounts to an implied term that tells us which FAR we're talking about? Because implied terms, Your Honor, cannot trump express provisions. And the question is whether Mesa's interpretation to apply the flight attendant regulations is arguably allowed under Section 7, the provisions that I've just read. And what the Supreme Court says you have to do is to look at the language of the agreement and determine from that language if the carrier's position is arguably justified. The union concedes there's nothing in the agreement that would prohibit the application of the flight attendant FARs to the flight attendants. So in light of the fact that there – Counsel – Counsel – versus Railroad Labor Executives case? I'm sorry, Your Honor. I didn't hear the first part of the sentence. All right. You're referring to the Consolidated Rail Corporation versus Railroad Labor Executives Association. Yes. What I'm saying is it's coming right out of the Conrail case. That's correct, Your Honor. Okay. The language for an employer asserts the contractual right to take the contested action. And the ensuing dispute is minor if the action is, as your words, arguably justified. That's correct, Your Honor. Thank you. Yeah. Not only is Section 7 of the contract implicated by its plain language, but also Section 24, the Management Rights Section, which says that except as expressly restricted by the agreement, the company retains the right without limitation to establish, amend, or suspend regulations and to establish, suspend, or change flight attendant schedules. There is no express restriction in the agreement by AFA's own admission. There is nothing in the agreement that prohibits the flight attendant regulations from being applied. And so the plain language there, as well as the plain language of Section 7, arguably supports the company's position that it's got the right to apply either the pilot regulations or the flight attendant regulations. And just so I'm clear, if we hold that this is minor, that means you've got arbitration. If we hold that it's major, you're in Federal court. That's correct, Your Honor. And if you hold it's minor, the court has no jurisdiction. The union has a remedy. The union will plead its case before an arbitrator who's an expert in these matters who will find whether or not our arguable interpretation is correct or not. A second. Does it matter, Mr. Manson, that this issue arose during the renegotiation of the collective bargaining agreement and the company essentially unilaterally imposed a change, and this is now a change in the status quo? Not at all, Your Honor. The following of a Section 6 notice in no way changes the court's determination as to whether the dispute is major or minor. And there's a great discussion of this point in the Conrail case as well. Well, I read Conrail, but why isn't this more like Shoreline or Shortline where the railroad wanted to change the place where the railroad people reported for duty? Because in Shoreline there wasn't any contract provision that either the carrier or the union pointed to that gave the carrier the right to establish an outlying domicile like that. Unlike that, in this case we have a specific provision, two specific provisions of the contract that give the carrier the right arguably to apply the flight attendant regulations instead of the pilot regulations to the flight attendant group. You know, this may be an odder case if you were trying to apply the pilot regs to the flight attendant group. What the company is trying to do is to apply the flight attendant regs to the flight attendant group. Now, the Supreme Court has said in defining what the arguably justified test should be, you also look at the bargaining history of the parties. And the company deposed the union negotiator, the former president of the union, the party entrusted with a responsibility to determine grievances and questions of interpretations of the agreement as signatory to the contract as to whether or not it had the right under Section 7 to apply the flight attendant regulations. And her testimony was that the company did. Yeah. Now, you're down under a minute. Do you want to save that last little bit? Well, no. I want to make one more point, Your Honor. I think it's important. And that is even if the Court found that this were an implied term, which of course it couldn't under our analysis and the court's decisions that we've filed, you still would have the right under Section 24 on the management rights clauses to make the change. And the Teamsters case, Southwest case, which we've cited, clearly establishes that. And the judge couldn't get around that. The judge couldn't get around an implied term trumping that management rights provision to change. So she said, well, there is an express provision, and it's because I interpreted the section section applicable FAR language to mean pilot regs, and that's an explicit interpretation. That's just clearly erroneous as a matter of law, Your Honor. Okay. Time's up. We'll have the other side, but we will give you a minute to respond. Thanks. Good morning. May it please the Court, Edward Gilmartin on behalf of the Association of Flight Attendants, CWA. So why do you want to get away from an expert arbitrator and into the hands of an inexpert Federal judge? Because we trust the Court's more, Your Honor. Then stay for yourself. We do plenty of arbitrations. Your Honor, in this case, justice is very clear. Under Shoreline, when you have an objective working condition, which has been in place since this company started business in 1995, you begin negotiations to amend the existing agreement on the status quo provisions of the Railway Labor Act, which are the central provisions of the act in that it requires both parties. This obligation runs both ways. The union cannot strike. They cannot engage in any economic activity that would harm the company, and the company must abide by the agreement and the existing working conditions. But counsel, Shoreline was decided 20 years before Conrail. Why should we find that all status quo conditions are protected from unilateral change? This argument would eliminate the distinction between major and minor disputes, would it not? Your Honor, no, I respectfully disagree. I think Conrail actually affirms Shoreline, and it said in the event there's a major dispute, that is when one party, the company here, tries to create new rights, different rights than what the contract provides and what the objective working conditions are, that's a major dispute. Those issues, that new right they want to obtain, must be obtained through the mandatory negotiations. This is what makes the Railway Labor Act so unusual. It's a statute that covers two industries, the railroad and the airline, for a very simple reason. Disruptions in those industries cause incredible impacts economically, socially, throughout the country. One airline, United Airline, going down on strike, and literally hundreds of thousands of people are inconvenienced. Because of that. Let me just follow up here by saying that we're not here to decide whether MACE's long-term, long-standing practice of using the pilot FARs means that there was not a permissible construction of the CBA. But all we're here to decide, as I understand it, and correct me if I'm wrong, is whether MACE's argument is arguably justified. Why isn't it arguably justified? The FARs are not defined in the CBA, and the management rights provision. Well, Your Honor, first let me address the management rights provision. And Mr. Manson went to great length about our former union president. Without getting into too much detail, I can say her testimony was not credible. The judge did not address it because she found there was no need to address the irreparable harm or the management rights issue. All she said was it doesn't change the analysis. There was no dispute, absolutely no dispute here, when the term applicable FAR maximum refers to the pilot FARs, the pilot duty time limitations. There is no dispute. So we know what the existing practice is, and that's where Shoreline comes in and says, because it's so important to maintain the status quo, to promote bargaining, to prevent disruptions to interstate commerce, you have to keep in place all of the conditions, those written in the agreement and those that are objective. The applicable FARs, there is no dispute. We all know what they mean. It would be no different than if MACE had decided to reduce the pay by a dollar an hour, even though we have a ---- But Mr. Manson's response to that is that there, in Shoreline, there was no provision in the collective bargaining agreement that addressed the railroad requiring its workers to report to a new location. Here, as he referred us to, we have Section 7 that goes on for pages and into exhaustive detail on block-to-block time and layovers and golden days and all this stuff. Well, Your Honor, if I may, those provisions ---- The bargaining agreement addresses ---- But those provisions, if I can explain, because I think it's an important distinction we have to remember, those provisions he's referring to are not contained in the regulations. The regulations stand on their own as a federal regulation, which provide caps on how much ---- It's the pilot regulations, but the carrier has the option of also scheduling the flight attendants under the same rates.  And my question is, can't Shoreline be distinguished on the grounds that this collective bargaining agreement contains detailed provisions regarding the terms and working conditions of the flight attendants and references the FARs? And now the company is saying, we are making a change from the pilot to the flight attendant FARs, which is a topic that is already covered in the collective bargaining agreement. Why isn't this more like Conrail than Shoreline? Well, because, again, I think you have to look at what the objective working conditions are. Once you get into negotiations, you cannot change them. Whether they're explicit or implicit, it's the same effect. They must remain in place. It just so happened in Shoreline that, yes, the way in which the railroad workers were assigned to their positions was not discussed. It was a habit that developed over time. Both parties acquiesced, and when the company tried to impose a new way to send them out to their stations, the union threatened to strike. And the company brought them to court to enjoin them, and the court denied the injunction and turned around and joined the company. But the court found it significant, did it not, that the whole issue was a subject that was not addressed in the collective bargaining agreement, whereas it is addressed in Mesa? But I would look at it a different way, Your Honor. I would look at Shoreline as expanding the scope of the status quo. That's what's significant. This is the first time the Supreme Court said, and they rejected Shoreline's argument, that you have to look at Section 2.7, which talks about you cannot change the rates of pay, rules, and working conditions unless you go through the procedures. But the court said, well, that's correct. But it's also the broader working conditions the parties have been working under for a long time, because even though not every working relationship or condition or term is going to be in the agreement, but it will have significant impact on the workers if the company, in negotiations, decides to unilaterally change it. It couldn't cause a strike. Let me ask you this. As I understand the fight as to whether it's major or minor, it's really going to turn on what FAR means in Section 7. So, for example, Section 7G2 says flight attendants on reserve duty day are on standby for periods up to the, quote, applicable FAR maximum. FAR doesn't stand for flight attendant regulation. It stands for FAA regulation. That's right. And the question is, what's the applicable FAR regulation? Mesa argues that it's any potentially applicable FAR regulation, including flight attendant regulation. Why is that? That may be a totally losing argument. Why is that not, however, a sufficiently arguable position? Because if you look even to Conrail, what is arguably justified? You look at the provision or the customer practice, and what are the parties' relative positions? We're in agreement. It's the pilot FARs. It's been the only way, the only template they've used to schedule. Right. You're in agreement. They're disagreeing. But we have been. Another fact we have to remember, though, is the Act is designed to resolve these issues in negotiations. As we said in the record, we introduced a contract proposal on scheduling where we basically took part of the pilot and we took part of the flight attendant and kind of merged them because the pilot takes a different approach. It caps the amount of flight hours that you can fly in a week, a month, a year, whereas the flight attendant, the only thing it's concerned with is the amount of rest you get. And you can schedule them for 14 hours a day, then for 16 or 18 if you add more crew. So it's a different approach. For pilots, we don't want them to be fatigued. Let me try to understand the practicalities of this. If you're in court rather than in arbitration, you get an injunction against the unilateral imposition of this by the company. If you're in arbitration and the company decides to impose this unilaterally, do you have a comparable protection against that happening unilaterally pending the arbitration? Well, under the existing case law, the only way we can join them until we arbitrate it is if it's a much higher standard. You have to show there's an impact that will disrupt the operations, basically. It's a Missouri, Kansas, Topeka case, which talks about that. There is certain circumstances you can join the action pending arbitration. Courts rarely issue it. So the choice to form judge or arbitrator means not only judge or arbitrator, but it may also mean what happens or doesn't happen during the pendence of the arbitration or judicial process. That's right. Under normal circumstances, it would be very difficult, and we admit, to get an injunction pending arbitration. That just wouldn't happen. We'd have to wait until the arbitrator hears the case. It could be a year. They would impose this. Meanwhile, we're at the negotiating table trying to negotiate a provision to address their concerns because the company's problem is at the end of the year, people keep running out of time. You can only work 1,000 hours in 12 months. When it comes to Thanksgiving, they're running out of personnel because they're timed out. It also gives our flight attendants an opportunity to work more because there are people who want to work more than 1,000 hours. So we're trying to address that in negotiations, and that's exactly where we're here. We want to negotiate it. We actually think we're close to an agreement, and we can resolve this issue. And we felt we had to get this injunction in order to put pressure on the company to remind them that negotiating table is the place where the act dictates these have to be resolved. Okay. Thank you. Thank you very much. Would you like one minute to respond? Yes. Just a couple of things. Conrail makes clear that the carriers have rights to make changes as long as they are arguably allowed by the contract. So it doesn't matter whether we use the pilot regulations for 5 years, 10 years, 15 years, 20 years. In the Alton case, a railroad had people come to work at 7 o'clock for 33 years and change it to 8 o'clock. Because it was arguably allowed by the contract, the court found that the carrier had the right to do it, and that's the same result that should flow here. Again, I would emphasize, even if there is an implied term that the pilot regulations apply, it does not trump the rights under Section 24, because that implied term is not an express restriction in the contract. And, again, the union's key negotiator and signatory to the contract agreed that we had the right to make the change also under Section 24. And, finally, the court on the preliminary injunction held no hearing, which is required by law. So, Guardia, there was no cross-examination of live witnesses. There was no finding of irreparable harm. This is all addressed at page 20 of our brief, but it's in violation of 29-107. Thank you. Thank you very much. Thank both sides for your ---- Do you have one minute to rebut, Your Honor? No. Okay. No. The system is he starts, you go, he rebuts, and then everybody goes home. Thank you. It was a useful argument on both sides. Thank you. Now, this is a good shift time, so take whatever your time is. You've got an 11 o'clock class. Get out of here. Okay. And the court will take a five-minute recess.
judges: Nelson, Fletcher, Tallman